# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 43281

EDWARD JORDAN, )
                                    )       **Boise, May 2016 Term**
     Claimant-Appellant, )
                                      )       **2016 Opinion No. 94**
v. )
                                        )       **Filed: September 9, 2016**
DEAN FOODS, Employer; )
ACE INSURANCE; and INDEMNITY )       **Stephen Kenyon, Clerk**
INSURANCE COMPANY OF NORTH )
AMERICA, Sureties, )
                                        )
     Defendants-Respondents. )

Appeal from the Industrial Commission of the State of Idaho.

The decision of the Industrial Commission is <u>affirmed</u>.

Goicoechea Law Offices, Chtd., Boise, for appellant. Justin P. Aylsworth argued.

Bowen & Bailey, LLP, Boise, for respondents. Scott Wigle argued.

_____

HORTON, Justice.

        This is an appeal from a decision of the Industrial Commission (the Commission) finding that Edward Jordan failed to prove entitlement to additional benefits for accidents that occurred during his employment. The Commission based its decision, in part, on a finding that Jordan failed to prove that the need for his 2012 cervical spine surgery was caused by a 2010 accident that occurred while Jordan was working as a milk delivery driver for Dean Foods. We affirm.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

        Jordan served over twenty-one years in the Navy, retiring in 2003. While in the Navy, Jordan was never assessed with a service-related disability involving his cervical area.[1] After retiring from the Navy, Jordan and his wife moved to Boise, and he started working for Dean Foods as a milk delivery driver.

_____

[1] Jordan did testify that during his service in the Navy he had issues relating to his neck consisting of "a couple evaluations" for "muscle strain" after diving and following an automobile accident. The Commission noted that Jordan had a history of documented neck issues between 1999 and 2001.

1

On May 16, 2006, Jordan suffered an injury while trying to move a stack of milk containers (the 2006 accident). Jordan testified he experienced a sudden onset of pain in his neck and shoulders along with numbness extending down his arms. He notified a supervisor after he dropped a gallon of milk due to the numbness. Jordan sought treatment for neck, cervical, and radiculopathy symptoms. He had an MRI on May 25, 2006 (the 2006 MRI), which showed disk degeneration in Jordan's cervical spine and a disk bulge at C4-5. Jordan's symptoms lessened over the course of about four months of treatment, and Jordan was diagnosed with muscle strain and carpal tunnel syndrome. After Jordan's symptoms subsided, he was not assigned any permanent work restrictions, and he resumed his normal job activities.

On January 12, 2010, Jordan was working in the Dean Foods yard using a dolly to hook up trailers when he again experienced the sudden onset of pain in his neck and shoulders along with numbness in his arms (the 2010 accident). The injury resulted in four doctor visits (January 12, January 25, February 4, and February 16), several physical therapy sessions, and a lidocaine injection to Jordan's mid-back. Notes from Jordan's second doctor visit indicate that by January 25, 2010, he represented that "his neck is no longer giving him problems." Jordan was eventually discharged by phone. His discharge notes state that he was asymptomatic and tolerating normal activity and work on March 22, 2010.

Jordan's next documented complaint about his neck occurred on July 26, 2011, when Jordan visited his family physician, Dr. Michael Foutz. The visit primarily concerned low back and knee problems. Notes from the visit indicate Jordan also was experiencing: "Neck pain which is [static] in nature--no better or worse."

On August 18, 2011, Jordan was evaluated by an orthopedic surgeon, Dr. Timothy Doerr, who noted:

> Edward is a 47-year-old gentlemen who comes in today with several complaints. The first is a known history of axial neck pain that he reports has been going on for several years. He reports that he had an industrial injury about six years ago, at which time he began having pain radiating in the right greater than left arms. He had neck pain prior to this injury but no arm pain prior to the injury. He was treated with physical therapy but his symptoms never [fully] resolved. He has had some generalized weakness, as well as some numbness in both hands, which he was told at the time of his work comp evaluation, was secondary to carpal tunnel syndrome.

Dr. Doerr attributed Jordan's neck issues to the 2006 accident, reasoning: "Given that he reports that he had no radicular arm symptoms prior to his industrial injury of 2006 it appears that this

may be related to his previous industrial injury." Dr. Doerr ordered an MRI, which was taken on August 23, 2011 (the 2011 MRI). The radiologist compared the 2011 MRI results with those from the 2006 MRI and concluded there was further degeneration in Jordan's cervical spine. On September 15, 2011, Dr. Doerr followed up with Jordan after the 2011 MRI and recommended a C4 to C6 cervical decompression and fusion. Dr. Doerr again attributed the need for the surgery to the 2006 accident, noting:

> Edward has a six year history of symptoms since an industrial injury on 05/16/06 which has been unresponsive to activity modifications, physical therapy and oral steroids. He had an MRI of the cervical spine on 08/23/11 that revealed broad-based disc/osteophyte at C4-5 and C5-6 resulting in mild cord compression with severe right greater than left foraminal narrowing at C4-5 and severe bilateral C5-6 foraminal narrowing.... Having failed six years of conservative treatment, he is electing for surgical decompression. I think that his best option would be a C4 to C6 cervical decompression and fusion. I have reviewed Edward's previous records from his previous industrial injury on 05/16/06. He had symptoms documented consistent with his current symptoms of neck pain with [predominantly] right arm radicular symptoms on his initial evaluation on 05/17/06 as well as subsequent evaluations on 05/25/06 and 06/02/06. Occupational Health Services on 07/24/06 documented that he had not had any tingling or similar radicular symptoms in his arm prior to the initial industrial injury. The patient reports that his symptoms never ever completely resolved and he was again seen at Occupational Health Services on 01/12/10 with similar [predominantly] right arm radicular complaints. Edward had an MRI of the cervical spine on 05/25/06, which is compared to the most recent MRI. The MRI on 05/25/06 revealed moderate size central disc protrusion at C4-5 with extradural defect on the cord. In addition, there was some right moderate foraminal narrowing at the C5-6 level. Although there has been some progressive degeneration since the MRI on 05/25/06, the patient's symptoms appear to be clearly related to this industrial injury, therefore I believe that it is medically more probable than not that his need for C4 to C6 anterior cervical decompression and fusion is directly related to his industrial injury of 05/16/06.

On September 27, 2011, Dr. Doerr wrote a letter to a third-party claims administrator, seeking authorization to perform surgery and detailing Jordan's cervical spine radiculopathy symptoms beginning in 2006. Dr. Doerr stated: "Although there is some progressive degeneration since the MRI on 05/25/06, the patient's symptoms appear clearly related to his industrial injury and I believe medically more probable than not his need for a C4 to C6 anterior cervical decompression and fusion is related to his industrial injury of 05/16/06."

Dr. Doerr later changed his opinion. On November 17, 2011, Dr. Doerr wrote a letter in which he asserted that Jordan's neck pain and radiculopathy were initially caused by the 2006 accident and then permanently aggravated by the 2010 accident. Dr. Doerr wrote:

> I have been treating Edward for C4 to C6 stenosis with neck pain and right greater [than] left arm radiculopathy. Edward had an industrial injury on 05/16/06, which resulted in neck pain with [predominantly] right arm radicular symptoms. He was then treated nonoperatively and had a second injury on 01/12/10, at which time he was moving a very heavy dolly and had onset of neck pain radiating into his right shoulder with numbness down into his right hand.

> In summary, I do believe that Edward's initial injury on 05/16/06 resulted in his C4-5 and C5-6 injuries causing neck pain with radiculopathy. His 01/12/10 injury resulted in a traumatic event with permanent aggravation of his initial preexisting injury. I have recommended a C4 to C6 anterior cervical decompression and fusion.

The record contains no explanation for Dr. Doerr's changed opinion.

In response to Dr. Doerr's suggestion that Jordan undergo surgery, the adjuster handling Jordan's claim scheduled an Independent Medical Examination (IME) by Dr. Robert Friedman. Dr. Friedman is a M.D. who specializes in physical medicine and rehabilitation. Based upon a December 22, 2011, IME, Dr. Friedman concluded that Jordan's symptoms were more probably than not related to preexisting degenerative cervical arthritis that was unrelated to the 2006 and 2010 accidents. Dr. Friedman based his opinion on his examination of Jordan and a review of Jordan's medical records, including the 2006 and 2011 MRIs. He explained that the disk degeneration in Jordan's cervical spine was consistent with ongoing degeneration rather than an acute injury.

On June 6, 2012, Jordan underwent surgery on his cervical spine at C4-5, C5-6, and C6-7. Jordan recovered from the surgery without complication, but Dr. Doerr imposed lifting restrictions. As a result of the restrictions, Dean Foods terminated Jordan's employment after it determined that it was unable to make reasonable accommodations which would allow Jordan to accomplish his essential job functions.

On December 19, 2011, prior to the cervical surgery, Jordan filed complaints with the Commission for both the 2006 and 2010 accidents. Dean Foods, Ace Insurance, and Indemnity Insurance Company of North America (collectively "Employer/Surety") answered, denying that Jordan was entitled to additional benefits under either claim. The Commission consolidated Jordan's claims. A hearing was conducted before a referee on July 18, 2013, where the only

issue was "whether the 2010 industrial injury caused, in whole or in part, Claimant's need for surgery in 2012." Jordan was the only witness to testify at the hearing, and his testimony focused on the 2010 accident as the cause of his need for the cervical surgery. Jordan testified that his symptoms following the 2010 accident were "a lot more extreme" than his 2006 accident symptoms, "they wouldn't go away," and "they progressively got worse."

The parties took and submitted post-hearing depositions. Jordan submitted the deposition of Dr. Joseph Verska, an orthopedic surgeon who opined that the 2010 accident was the "specific event" that caused Jordan's need for surgery. Employer/Surety submitted Dr. Friedman's deposition, in which he reiterated his earlier opinion that Jordan's neck surgery was necessitated by an ongoing degenerative condition and not the 2006 or 2010 accidents.[2] In a decision dated March 18, 2015, the referee recommended that the Commission find that Jordan failed to prove that the need for his 2012 cervical spine surgery was caused by the 2010 accident and that Jordan had abandoned the issue of whether the 2006 accident necessitated the surgery.

The Commission examined the case and issued its decision on April 13, 2015. The Commission chose not to adopt the referee's recommendation although it also decided Jordan's claims in favor of Employer/Surety. The Commission's decision differed from the referee's recommendation because the Commission decided to address the merits of Jordan's claim related to the 2006 accident rather than holding that he abandoned those claims. The Commission held that Jordan "failed to prove by a preponderance of evidence that his 2012 cervical spine surgery was necessitated, in whole or in part, by either the 2006 or 2010 industrial accidents.... All other issues are moot." Jordan timely appealed.

## II.    STANDARD OF REVIEW

"When reviewing a decision by the Industrial Commission, this Court exercises free review over the Commission's conclusions of law, but will not disturb the Commission's factual findings if they are supported by substantial and competent evidence." *Knowlton v. Wood River Med. Ctr.*, 151 Idaho 135, 140, 254 P.3d 36, 41 (2011) (citing I.C. § 72-732). "Substantial and competent evidence is relevant evidence that a reasonable mind might accept to support a conclusion." *Mazzone v. Texas Roadhouse, Inc.*, 154 Idaho 750, 755, 302 P.3d 718, 723 (2013). This Court is "constitutionally compelled" to give deference to the Commission's findings of

---

[2] The record also contains a deposition from Dr. Foutz, in which he declined to give an opinion on causation and stated he would "defer to" Dr. Doerr "on that question."

fact when they are supported by substantial and competent evidence. *Fife v. Home Depot, Inc.*, 151 Idaho 509, 513, 260 P.3d 1180, 1184 (2011); *see also* Idaho Const. art. V, § 9.

"The terms of Idaho's workers' compensation statute are liberally construed in favor of the employee." *Mazzone*, 154 Idaho at 755, 302 P.3d at 723. "However, conflicting facts need not be construed liberally in favor of the worker." *Id.* "This Court will not disturb the Commission's determination as to the weight and credibility of evidence unless clearly erroneous." *Id.* Thus, "this Court views all facts and inferences in the light most favorable to the party who prevailed before the Commission." *Dinius v. Loving Care & More, Inc.*, 133 Idaho 572, 574, 990 P.2d 738, 740 (1999).

### III.    ANALYSIS

Jordan's appeal only focuses on the 2010 accident as necessitating the cervical spine surgery. Jordan alleges that the Commission erred in two aspects: First, he asserts that the Commission erred by holding that he had the burden of proving medical causation; and second, he contends that the Commission's finding that the need for his cervical spine surgery was not caused by his 2010 accident is not supported by substantial and competent evidence.

**A.  The Commission did not err by determining Jordan had the burden of proving medical causation.**

The Commission held: "The claimant has the burden of proving the condition for which compensation is sought is causally related to an industrial accident." Jordan argues that the Commission applied the incorrect burden of proof on medical causation. Jordan contends that the Commission failed to: (1) apply a legal presumption "reversing the burden of proof to" Employer/Surety; (2) presume injuries arose out of Jordan's employment; and (3) resolve doubts in favor of Jordan.

"[C]ausation is an issue whenever entitlement to benefits is at question...." *Gomez v. Dura Mark, Inc.*, 152 Idaho 597, 601, 272 P.3d 569, 573 (2012). The claimant in a workers' compensation case carries the burden of proving that the condition for which compensation is sought is causally related to an industrial accident. *Serrano v. Four Seasons Framing*, 157 Idaho 309, 317, 336 P.3d 242, 250 (2014). In other words, "[the] claimant has the burden of proving a probable, not merely a possible, causal connection between the employment and the injury or disease." *Stevens-McAtee v. Potlatch Corp.*, 145 Idaho 325, 332, 179 P.3d 288, 295 (2008) (quoting *Beardsley v. Idaho Forest Indus.*, 127 Idaho 404, 406, 901 P.2d 511, 513 (1995)). Proof required for showing causation is "a reasonable degree of medical probability...." *Anderson v.*

*Harper's Inc.*, 143 Idaho 193, 196, 141 P.3d 1062, 1065 (2006). When causation is at issue, the Commission's role is "to determine the weight and credibility of testimony and to resolve conflicting interpretations of testimony." *Henderson v. McCain Foods, Inc.*, 142 Idaho 559, 565, 130 P.3d 1097, 1103 (2006). Because the Commission is the factfinder, this Court does not disturb conclusions of credibility "unless such conclusions are clearly erroneous." *Id.* at 566, 130 P.3d at 1104.

As the previous citations reflect, this Court has unequivocally held that a claimant has the burden of proving causation. Jordan misinterprets the applicable burden of proof by relying on decisions that relate to the different question as to whether an injury arose out of and in the course of employment. This Court has held that: "When an injury occurs on an employer's premises, a presumption arises that the injury arose out of the claimant's employment." *Vawter v. United Parcel Serv., Inc.*, 155 Idaho 903, 908, 318 P.3d 893, 898 (2014) (citing *Foust v. Birds Eye Div. of Gen. Foods Corp.*, 91 Idaho 418, 419, 422 P.2d 616, 617 (1967)). "Case law holds that doubts about an injury arising out of and in the course of employment are resolved in favor of the claimant." *Page v. McCain Foods, Inc.*, 141 Idaho 342, 348, 109 P.3d 1084, 1090 (2005). These rules apply to the statutory analysis of whether an injury arose out of and in the course of employment. *See id.* at 347, 109 P.3d at 1089; I.C. § 72-102. Whether Jordan's injury arose out of and in the course of his employment is not the issue presented by this appeal. We hold that the Commission did not err by determining Jordan had the burden of proving causation.

## B. Substantial and competent evidence supports the Commission's finding that the need for Jordan's cervical spine surgery was not caused by the 2010 accident.

The Commission held Jordan "failed to prove by a preponderance of evidence that his 2012 cervical spine surgery was necessitated, in whole or in part, by either the 2006 or 2010 industrial accidents." Jordan contends that substantial and competent evidence does not support the Commission's finding that his 2010 accident did not cause the need for his cervical spine surgery.

Under the Worker's Compensation Act, employees are entitled to compensation when they sustain injuries "caused by an accident arising out of and in the course of any employment...." I.C. § 72-102(18)(a); *see also Clark v. Shari's Mgmt. Corp.*, 155 Idaho 576, 579, 314 P.3d 631, 634 (2013).

We need look no further than the opinion of Dr. Friedman for substantial and competent evidence that supports the Commission's conclusion. The Commission held:

The most credible opinion is that of Dr. Friedman, who offered a cogent opinion that while the 2006 accident might have caused a C4-5 disk bulge, that lesion had healed by the time of the 2011 MRI and cannot fairly be said to be implicated in the need for Claimant's cervical spine surgery. By the same token, the conditions for which surgery was actually required, i.e. Claimant's well-documented multilevel degenerative changes, were years in the making, as evidenced by the 2006 and 2011 MRI studies, and cannot fairly be said to be the product of the 2010 accident.

Dr. Friedman opined that Jordan's symptoms were more probably than not related to preexisting cervical degenerative arthritis that was unrelated to the 2006 and 2010 accidents, and he explained that the disk degeneration in Jordan's cervical spine was consistent with ongoing degeneration and was not consistent with an acute injury. His opinion is consistent with the 2006 and 2011 MRIs. The 2006 MRI showed disk degeneration in Jordan's cervical spine and a disk bulge at C4-5. The reading radiologist interpreted the MRI:

C4-5: There is a small to moderate-sized central posterior protrusion with 6-7 mm of subligamentous cephalic migration. This results in some mild anterior extradural defect on the cord and thecal sac. This spinal canal is mildly narrowed but probably adequate. The neural foramina are normal.

C5-6: There is disk degeneration with mild posterior bulge/protrusion. The spinal canal is mildly narrowed. There is mild left and mild to moderate right foraminal narrowing.

C6-7: There is mild disk degeneration with a small right paracentral protrusion and [annular] tear. The spinal canal is adequate. There is mild bilateral foraminal narrowing.

The reading radiologist's comparison of the 2011 MRI with the 2006 MRI led him to conclude that there had been "[m]ultilevel degenerative changes of the cervical spine" which he described as:

C4-5 severe right worse than left neural foraminal stenosis.

C5-6 severe bilateral neural foraminal stenosis.

C6-7 mild right worse than left neural foraminal stenosis.

Compared with the previous examination there has been … interval progression of disc narrowing and broad-based osseous ridging/disc bulging at C4-5 and C5-6 levels.

Jordan makes the case that the Commission should have found other expert opinions, such as the opinions of Drs. Foutz, Doerr, and Verska, to be more persuasive. The question we must answer is whether substantial and competent evidence supports the *Commission's decision*, not whether substantial and competent evidence support's *Jordan's position*. *Clark*, 155 Idaho at

8

580, 314 P.3d at 635. Jordan ignores the standard of review and attempts to have this Court reweigh the facts.

Jordan also challenges the Commission's finding that his testimony lacked substantive credibility.

> When analyzing the Commission's findings regarding credibility, this Court has bifurcated the issue into two categories, "observational credibility" and "substantive credibility." *Painter v. Potlatch Corp.*, 138 Idaho 309, 313, 63 P.3d 435, 439 (2003). Observational credibility "goes to the demeanor of the appellant on the witness stand and it requires that the Commission actually be present for the hearing in order to judge it." *Id.* On the other hand, substantive credibility "may be judged on the grounds of numerous inaccuracies or conflicting facts and does not require the presence of the Commission at the hearing." *Id.*

*Moore v. Moore*, 152 Idaho 245, 254, 269 P.3d 802, 811 (2011). The Commission determined Jordan was not substantively credible because he "gave different stories to his providers/evaluators about the cause of his symptoms over the years."

Substantial and competent evidence supports the Commission's finding that Jordan was not substantively credible. Jordan's testimony before the Commission focused on implicating the 2010 accident as the cause of his need for cervical surgery. Jordan testified that his symptoms were minimal following his discharge for the 2006 accident, stating:

> Q. Upon discharge from treatment by the St. Luke's providers, how was your neck and cervical region feeling?

> A. I was still having occasional pain, but overall it was feeling a lot better.

Jordan testified that his symptoms from the 2010 accident were "a lot more extreme" than his 2006 accident symptoms, "they wouldn't go away," and "they progressively got worse."

However, medical records show that Jordan previously provided his physicians with different accounts of his condition. After the 2010 accident, Jordan visited the doctor four times. Notes from his second visit reflect that by January 25 he represented that "his neck is no longer giving him problems." Jordan's next documented complaint about his neck occurred on July 26, 2011, when Jordan visited his family physician, Dr. Michael Foutz. This visit primarily concerned low back and knee problems. Notes from the visit indicate Jordan also was experiencing: "Neck pain which is [static] in nature--no better or worse." Dr. Foutz's note that Jordan's condition was static conflicts with Jordan's later testimony that his condition "progressively got worse." Additionally, Jordan seems to have told Dr. Doerr that his symptoms commenced with his 2006 accident. Dr. Doerr attributed Jordan's neck issues to the 2006

9

accident, reasoning: "Given that he reports that he had no radicular arm symptoms prior to his industrial injury of 2006 it appears that this may be related to his previous industrial injury."

Although there may be other explanation for Jordan's diverging descriptions of his symptoms, we are constrained by the standard of review. There is substantial and competent evidence to support the Commission's conclusion that Jordan was not substantively credible due to his conflicting accounts regarding the cause and nature of his symptoms to his medical providers over the years.

Jordan also argues that Dr. Friedman's testimony lacks credibility because he did not review a May 25, 2012, preoperative MRI that showed no degenerative changes from an August 23, 2011, MRI. Jordan makes two arguments on this point.

First, Jordan argues the lack of differences between these two MRIs undermines Dr. Friedman's opinion that Jordan's cervical condition was the product of degenerative changes. The radiologist reading the May 25, 2012, MRI noted that there was "[n]o significant change compared to the scan dated August 23, 2011." Jordan does not identify testimony that the absence of "significant" changes in a span of nine months has medical significance to the question whether he had a degenerative disk condition.

Second, Jordan argues the Commission was "arbitrary" in its "refusal to consider its previous reproaches" of Dr. Friedman for failure to review other available images in two unrelated cases. Jordan significantly overstates the Commission's prior decisions when he characterizes the Commission as having "reproached" Dr. Friedman.

In *Bogar v. Sodexo Inc.*, IC 2009-018467, 2012 WL 7008847 (Idaho Ind. Com. Dec. 11, 2012), the Commission did make findings that were inconsistent with Dr. Friedman's opinions, finding the testimony of the claimant's treating physicians to be more persuasive. *Id.* at 5–7. At one point, the Commission noted that "Dr. Friedman apparently neither took nor reviewed any x-rays of Claimant's back" when formulating his opinions. *Id.* at 5. Other than explaining why it chose to find other physicians' opinions to be more persuasive, the Commission did not reproach or censure Dr. Friedman in any respect. To the contrary, the Commission concluded that "Defendants reasonably contested Claimant's assertions in reliance upon the opinion of Dr. Friedman." *Id.* at 12.

In the other case cited by Jordan, the Commission stated in its first opinion:

10

Of all the physicians who have hazarded an opinion as to whether Claimant suffered additional injury to his lumbar spine as a consequence of the subject accident, Dr. Friedman had access to the most complete set of pre and post injury medical records. Even so, he did not have access to the actual films for the 2002, 2005 and 2008 MRIs.

*Davis v. U.S. Silver-Idaho, Inc.*, IC 2008-031273, 2012 WL 7008855, at *9 (Idaho Ind. Com. Dec. 20, 2012). On reconsideration, the Commission then rejected Dr. Friedman's opinion that the claimant's lumbar condition was not the product of trauma, stating:

Dr. Friedman did not reconcile this opinion with what the Commission found to be the facts of this case; Claimant experienced a dramatic worsening of his symptoms immediately following the subject accident. Dr. Friedman did not explain how this sudden change can be squared with his belief that Claimant's condition worsened gradually over time. For these reasons, we find Dr. Friedman's opinion to be less persuasive.

*Davis v. U.S. Silver-Idaho, Inc.*, IC 2008-031273, 2013 WL 4405914, at *2 (Idaho Ind. Com. July 3, 2013). We can discern no reproach or reproval of Dr. Friedman in these decisions; instead, all we can see is a consistent approach by the Commission: consideration of competing opinions proffered by the parties' experts and an explanation why it found any particular opinion to be the most persuasive.

Jordan also suggests that because Drs. Verska and Doerr are orthopedic surgeons, their opinions should have been more persuasive than that of Dr. Friedman, who is "only" a physician specializing in physical medicine and rehabilitation. While this Court has held that "[t]he Commission may not decide causation without opinion evidence from a medical expert," *Anderson v. Harper's Inc.*, 143 Idaho 193, 196, 141 P.3d 1062, 1065 (2006), we have never gone so far as to suggest that the opinions of practitioners of one medical specialty are entitled to greater weight than the opinions of other physicians. Instead, we have recognized that "[a]s the factfinder, the Commission is free to determine the weight to be given to the testimony of physicians." *Fife v. Home Depot, Inc.*, 151 Idaho 509, 514, 260 P.3d 1180, 1185 (2011) (quoting *Gooby v. Lake Shore Mgmt. Co.*, 136 Idaho 79, 86, 29 P.3d 390, 397 (2001)).

As the factfinder, the Commission was free to find Dr. Friedman's testimony to be more persuasive. This testimony constituted substantial and competent evidence supporting the Commission's finding that the need for Jordan's cervical spine surgery was not caused by the 2010 accident. Based on this determination, the Commission did not err in determining all other issues were "moot."

11

**C. Jordan is not entitled to an award of attorney fees on appeal.**

Jordan requests attorney fees under Idaho Code section 72-804, contending the denial of Jordan's claim was unreasonable. "That statute mandates the award of attorney fees if the employer or surety contested a claim for compensation without a reasonable ground." *Fife*, 151 Idaho at 515, 260 P.3d at 1186. Since Jordan has not prevailed, Employer/Surety had reasonable grounds to contest Jordan's claim.

## IV. CONCLUSION

We affirm the Commission's decision that Jordan was not entitled to additional benefits for his 2010 accident because Jordan failed to prove his cervical spine surgery was necessitated, in whole or in part, by his 2010 accident. We award costs on appeal to Employer/Surety.

Justices EISMANN and W. JONES **CONCUR**.

Chief Justice J. Jones, specially concurring.

Even though Mr. Jordan put on a good case before the Commission, I am constrained to concur in the Court's opinion because substantial and competent evidence supports the Commission's findings on the issue of causation. Had the Commission decided in favor of Jordan, substantial and competent evidence in the record would have supported that outcome. This Court is not a finder of fact and it is well established that the Court will not disturb the Commission's factual findings if they are supported by substantial and competent evidence.

However, a couple of matters are worth noting. First, in keeping with what appears to be a fairly commonplace practice by the Commission in recent years, the Commissioners state that they chose "not to adopt the Referee's recommendation and hereby issue their own findings of fact, conclusions of law and order." It is unclear why the Commission would decline to adopt any of the factual findings by the Referee but then make factual findings identical to those of the Referee for the first 76 findings of fact. It seems that the drafting of findings by the Commission and the review of those findings by this Court would be simplified if it was not necessary to compare the Referee's and the Commission's findings side-by-side in order to see if or where they differ. Further, it is not entirely clear why the Commission employs referees if it routinely dismisses their entire work product to make its own findings of fact.

Second, while the Commission was unable to judge Jordan's observational credibility on the stand because the case was heard by a referee, the Commission goes on to say that "while

12

Referee Marsters' proposed recommendation found that Claimant was not credible, she did so on the basis that Claimant lacked 'substantial credibility,' that is, Claimant's testimony is irreconcilable with other testimony and facts of record." This would lead one to believe that the Referee found Jordan to be untruthful. That is not necessarily the case. According to the Referee, "Claimant's testimony at the hearing regarding the progression of his symptoms appeared credible; however, it conflicts with the evidence presented through his medical records, which is also credible. Claimant, understandably, did not remember all of the symptoms he reported to his physicians, or when, and he did not assert that the relevant records were in error." Leading up to this conclusion, the Referee posited some possible reasons that the Claimant did not earlier make complaint about some of his symptoms. For example, she posited that his "high pain tolerance and focus on other injuries could have played a part" in failing to seek additional treatment prior to late summer 2011. Being a veteran of military service, it is quite possible that he was an adherent of a "grin and bear it" philosophy of life. The Commission's finding on Claimant's credibility does not square up with that of the Referee and tends to portray the Claimant's truthfulness in an undeserved and unfavorable light. If the Commission had simply adopted the Referee's finding on credibility, this would not have been a problem.

Justice BURDICK CONCURS.