# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 51856-2024

|  |  |  |
|---|---|---|
| SHASTA PROULX,<br>fka SHASTA FIGUEROA,<br><br>   Claimant-Appellant,<br><br>v.<br><br>SAVEWAY MARKET, INC., Employer; and<br>AMTRUST INSURANCE CO. OF KANSAS,<br>INC., Surety,<br><br>   Defendants-Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Pocatello, October 2025 Term<br><br>Opinion filed: December 31, 2025<br><br>Melanie Gagnepain, Clerk |

Appeal from the Idaho Industrial Commission.

The decision of the Idaho Industrial Commission is <u>affirmed</u>.

Petersen, Parkinson & Arnold, PLLC, Idaho Falls, for Appellant. James C. Arnold argued.

Bowen & Bailey, Boise, for Respondents. Rachel M. O'Bar argued.

---

ZAHN, Justice.

Shasta Proulx appeals from a decision of the Idaho Industrial Commission denying her claim seeking benefits for a herniated nucleus pulposus[1] at the C6-7 level. Proulx was involved in a work-related accident, after which she complained of shoulder and neck pain. Proulx received worker's compensation, temporary disability, and medical benefits. Proulx was given work restrictions by her doctor and performed light duty work for several months before indicating she was unable to perform the light duty work offered by her employer. A physiatrist[2] conducted an independent medical exam ("IME") and declared Proulx to be at maximum medical improvement.

Proulx then sought care from a different medical provider who opined that her symptoms were caused by a bulging disc in her cervical spine that was caused or aggravated by the accident. The provider sought authorization from the surety to perform a surgical procedure. The surety

---

[1] The nucleus pulposus "is the inner gel-like portion of the intervertebral disc. It is essential in giving the spine its mechanical flexibility and strength." Daniel Nedresky et al., Anatomy, Back, Nucleus Pulposus, National Library of Medicine, National Institutes of Health, https://www.ncbi.nlm.nih.gov/books/NBK535373/ (updated Aug. 7, 2023).

[2] Physiatrist: "a physician who specializes in physical medicine and rehabilitation." *Physiatrist*, Merriam-Webster Medical Dictionary, https://www.merriam-webster.com/medical (last visited Dec. 30, 2025).

obtained a second IME, which concluded that surgery was not indicated, and the surety denied the surgical authorization request.

Proulx filed a worker's compensation complaint seeking a determination that her cervical spine issues were caused by the accident and seeking an award of temporary disability and medical benefits. The Commission determined that Proulx failed to establish that the injury was caused by the accident or that the requested treatment was reasonable. Proulx appeals, arguing that the Commission's findings are clearly erroneous. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On December 17, 2019, while working at Saveway Market, Proulx lifted a box of potatoes and the box partially "gave out," causing her left arm to "jerk" downward, resulting in "searing pain" in her neck, shoulder, and the area of her shoulder blade. Two days later, on December 19, 2019, she reported the injury to her employer and sought medical care at Steele Memorial Clinic. She reported "left shoulder pain" as well as "neck pain (left side of neck)." An x-ray of her left shoulder showed "[n]o radiographic abnormalit[ies]." The provider assessed a shoulder strain, provided a Toradol shot, ordered that Proulx work only on "light duty" with no lifting over five pounds, and planned to reevaluate Proulx in a week.

Proulx returned to the clinic the next day complaining of severe left shoulder pain that began halfway through her shift. She also complained again of "neck pain (when turning to the left, slight[ly] more [range of motion] today than yesterday)." The provider prescribed pain medication and ordered that Proulx not work for a week, use a sling, and follow up in seven days.

A week later, Proulx's symptoms had not improved. She experienced significant tenderness over her left shoulder with limited range of motion and reduced strength in her left arm. The provider ordered an MRI of Proulx's shoulder, ordered continued use of a sling, and directed no work for an additional week. The MRI of Proulx's shoulder was taken on January 8, 2020, and identified no tears to tendons or the rotator cuff. A provider read the MRI as "normal" and referred Proulx to orthopedics and physical therapy. Proulx was permitted to return to work on light duty with no lifting over five pounds.

Proulx visited the clinic again on January 14, 2020, where she was assessed for "[l]eft shoulder strain, sequela,[3]" "[n]eck pain," and "[l]eft arm pain." She noted for the first time that

---

[3] Sequela: "an aftereffect of a disease, condition, or injury." *Sequela*, Merriam-Webster Medical Dictionary, https://www.merriam-webster.com/medical (last visited Dec. 30, 2025).

she was experiencing "slight numbness and tingling in her extremities." The provider imposed additional work restrictions, including not lifting "anything with her left arm."

On January 20, 2020, Proulx returned to her provider complaining of "severe" and "persistent left neck and shoulder pain," even when she did not use her left arm and even with consistent use of a sling. She "denie[d] any numbness or tingling in her arm or hand." An examination noted "[n]ormal range of motion" in her neck, but with decreased range of motion in her left arm. The provider noted that Proulx was "complaining of left shoulder pain during the physical exam but then states, explicitly, her shoulder doesn't hurt, it is her neck." The provider wrote that he "watched the patient as she put her sling on, by herself, and she was able to adduct, abduct, and rotate her arm with no difficulty." He stated that he believed Proulx was injured in the accident but was "not confident that her presentation isn't slightly exaggerated." He prescribed additional medication, ordered Proulx to return in four weeks, and ordered that she not be required to lift, pull, or push anything weighing more than five pounds with her right arm, and not be required to perform any of those actions with her left arm.

On February 4, 2020, a provider ordered an x-ray of Proulx's cervical spine. The "Findings" provided: "Straightening of the normal cervical lordosis. Vertebral heights are maintained. Disc spaces are preserved. C1-2 relationship normal. Prevertebral soft tissues normal." The provider stated that Proulx should proceed with conservative care, such as physical therapy, before he would order additional imaging of Proulx's neck. Proulx was not permitted to return to work for an additional two weeks. She began physical therapy the same day.

Roughly two weeks later, during a medical visit on February 20, 2020, Proulx reported significant improvements. She stated that she was "no longer having issues with headaches." Proulx also denied numbness, tingling, loss of sensation in the extremities, and stated that she was only feeling "some pain," with "minimal" radiation down her left arm after "prolonged use." Proulx was ordered not to return to work for another two weeks.

On March 5, 2020, Proulx again reported significant improvement, with no headaches, minimal radiation down her arm, and only "some pain" after "prolonged use." She was permitted to return to work for a maximum of three hours at a time, with a five-pound weight limit on her left arm, no awkward prolonged positions, and no prolonged cervical flexion. One week later, she reported some occasional pain "across the shoulder" but "decreased pain exacerbations," and no headaches, numbness, tingling, or loss of sensation in the extremities.

On March 26, 2020, Proulx reported that "physical therapy . . . has helped her pain improve considerably," that she could work approximately three hours before the pain was too much, and that the pain radiated down her left arm to roughly her deltoid, but no longer into her fingers. The provider noted that, "[i]n the exam room, the patient continues to show no distress or deficits in her movement." He stated that, "[d]uring normal conversation she is moving her head, arms, and shoulder with no apparent difficulty, however, her history suggests a different story." He ordered a cervical "CT just to make sure nothing is being missed," concerned that "there [was] some incongruity with her injury, the duration of her symptoms, and her clinical presentation." Finally, he stated that he would "likely clear her to return to work with no restrictions" if the CT provided no evidence of cervical injury.

The CT of Proulx's cervical spine without contrast was taken on April 2, 2020. The "Findings" stated: "The cervical spine is normal in appearance. There are no fractures or subluxations. The intervertebral discs are normal in height. No disc protrusions are seen although MRI is a more sensitive modality looking for disc protrusions. The prevertebral soft tissues are normal in thickness."

At follow up visits on April 9 and April 27, 2020, Proulx continued to report improvement, and her provider increased the time she could work from four to five hours, and then from five to six hours, with the same restrictions on use of her left arm. However, on April 30, 2020, Proulx returned complaining of "very severe" pain radiating down her left shoulder blade. She attributed the exacerbated pain to her employer "request[ing] that she utilize her right arm to assist in her ability to stock by sliding goods forward with her right [hand] and into place with her left [hand]." Because Proulx's symptoms had dramatically escalated, the provider told Proulx she would "advise Workman's Comp of a need for her to have an IME performed." The provider also noted that Proulx had "full range of neck in flexion/ext [sic] and rotation," but that Proulx would not let her palpate Proulx's left arm.

On May 7, 2020, Proulx stated that she had slightly improved from the week prior but expressed concern that her pain was no longer as well controlled and stated that her "range of motion of her neck is significantly diminished." She "[n]oted that her pain aggravated at work with increase in weight limit as well as working hours." The provider entered a new work restriction including a maximum six-hour shift, with a maximum right arm weight of eight pounds, a

maximum left arm weight of three pounds, avoidance of awkward positioning, and only intermittent cervical flexion.

On May 8, 2020, Proulx and her employer disagreed whether certain assigned tasks—in particular, moving products from the back of shelves towards the front—were consistent with her work restrictions. Proulx has not worked since that date. Prior to that date, she had been receiving temporary disability benefits. The surety terminated those benefits effective May 7, 2020.

An IME was conducted by Dr. John A. Vallin on May 26, 2020. Dr. Vallin opined that Proulx had likely suffered a "sprain/strain" involving Proulx's "left shoulder/shoulder girdle muscles." He believed Proulx's symptoms associated with her lateral neck and trapezius were "causally associated with the shoulder girdle strain/sprain." However, he stated that "[t]he objective medical evidence indicates that on previous examination, [Proulx] reported radiating pain into her left scapular region with cervical flexion." Because "C4, C5, C6, and C7 nerve root compression can refer pain to the shoulder girdle as the only presenting symptom," Dr. Vallin ordered an MRI of Proulx's cervical spine. Dr. Vallin deferred a determination of whether Proulx had reached maximum medical improvement ("MMI") and whether she had any permanent physical restrictions until after he reviewed the MRI.

That MRI was completed on July 6, 2020. Dr. Vallin authored an addendum to his initial IME report the next day. Based on the MRI report, Dr. Vallin stated that Proulx "has diffuse degenerative changes throughout her cervical spine, [but] these findings do not correlate anatomically with the diffuse nature of [Proulx's] left-sided soft tissue/myofascial symptoms." He concluded that the "abnormalities" in Proulx's "cervical MRI are not causally associated with nor permanently aggravated as a result of her claimed injury on December 17, 2019." He opined that Proulx had reached MMI; assigned a 6% impairment rating of the upper extremity, which equated to a 4% whole person impairment rating; and opined that there was no objective basis to support any restriction on her work.

Based on Dr. Vallin's report, the surety notified Proulx that no additional benefits for medical treatments would be paid as of July 7, 2020, and that Proulx would begin receiving permanent partial disability payments. On October 5, 2020, the surety provided notice that Proulx's permanent partial disability benefits had been fully paid.

Proulx then sought care outside of the worker's compensation system, visiting Dr. Benjamin Blair on August 20, 2020. In that initial visit, Dr. Blair indicated that Proulx had a

5

"[m]ultilevel herniated disc cervical spine," which he proposed treating with further conservative care, and if Proulx elected the procedure, an epidural steroid injection. Proulx elected to undergo the epidural steroid injection. That procedure was performed on September 30, 2020. It provided little to no relief.

Dr. Blair then stated that Proulx had "multilevel spinal stenosis" and ordered a "myelogram post myelogram CAT scan" to "further delineate [the] extent of neurologic impingement." Dr. Blair later testified that a "CT Myelogram" involves adding a dye to the subject's spinal fluid to provide greater contrast between the nerves and the spinal fluid, making it easier to determine whether there is a pinched nerve or impingement on the spinal cord. That test was completed on October 29, 2020. Under "Impressions" the record of the test reflects: "1. Straightening and mild reversal the normal curvature cervical spine can be associated muscular spasm," and "2. Mild central disc bulge at C6-7 with slight impression on ventral thecal sac and mild narrowing of the spinal canal to 10 mm in AP dimension at C6-7."

At a visit on November 4, 2020, Dr. Blair diagnosed "[c]entral distal secondary cervical stenosis C6-7." He offered a surgical option of an "anterior cervical discectomy and interbody fusion utilizing sharp lateral allograft and anterior cervical plate C6-7 level," or additional conservative care. He warned Proulx that her symptoms may continue even after the surgery. Based on her prior failed conservative care and the severity of her symptoms, which Dr. Blair characterized as "severe enough to interfere with activities of daily living," Proulx elected to proceed with the surgery.

Prior to surgery, the surety requested an additional IME, which was performed by Dr. Lynn Stromberg. Dr. Stromberg's report indicates the "[d]ate of examination" was January 14, 2020. Dr. Stromberg later testified that he believed that was a mistake and the examination occurred on January 14, 2021. Dr. Stromberg reviewed all existing imaging, including the CT myelogram most recently ordered by Dr. Blair. He claimed that the MRI taken of Proulx's cervical spine on July 6, 2020, showed "minor bulges C5-6, C6-7 with annular fissure at C5-6." "There is plenty of room for the cord. There is still CSF around the cord at all levels. The cord is not compressed." With respect to the CT myelogram taken October 29, 2020, Dr. Stromberg concluded that it showed "minor indentation of the thecal sac at C5-6, C6-7 on a single sagittal view. The other views don't show this." He reviewed nerve conduction and EMG studies conducted on January 26, 2021, and

6

determined they provided "no indication of neuropathy, myopathy, or radiculopathy in either upper extremity."

Proulx identified her pain as originating in her posterior neck and radiating "superiorly up over her entire top of her cranium, then extend[ing] down her back by the scapula across the trapezius and down her left upper extremity." She claimed that it was a "[p]ain level 9," with "[a]ching, burning, [and] numbness" extending from behind her ear, over the trapezius, down her arm, and into the "ulnar digits" of her left hand. Dr. Stromberg claimed that Proulx had "significant signs of symptom magnification," and her "9/10 pain is unquestionably out of proportion to her presentation." According to Dr. Stromberg, the "record shows significant inconsistencies over time," with the "original complaint . . . strictly of left shoulder pain" and "[n]o complaints . . . voiced regarding the neck or the left upper extremity beyond the shoulder." He stated that there were "no objective indications of abnormalities of neurologic function on Electrodiagnostic studies or physical examination" and that the "[r]adiology studies are normal." While Dr. Stromberg acknowledged that a "disc bulge [was] noted," he stated that it would "not cause stenosis and could not produc[e] the reported symptoms." He concluded that there was (1) no reason for further medical intervention, (2) he would not recommend any invasive procedures, (3) Proulx had no permanent physical impairment, and (4) she was fit to return to work.

Several months later, Dr. Blair completed his own medical evaluation. He concluded that the most recent imaging, the "Myelogram, post-myelogram CT scan," revealed a "fairly large central disc bulge with secondary stenosis at C6-7." Though he acknowledged that Proulx initially presented with "shoulder symptomology," he opined that all of her symptoms were attributable to a "herniated nucleus pulposus at the C6-7 level" that she suffered in the accident. He opined that Proulx had not reached medical stability and suggested that additional MRIs of her cervical spine and brain were warranted to determine what additional treatment was appropriate. He recommended a whole person impairment rating of 8%.

The additional MRI of Proulx's cervical spine was taken on May 24, 2021. It showed "[u]nchanged mild multilevel degenerative changes of the cervical spine as described without significant spinal canal or neural foraminal narrowing." With respect to the C6-7 level in particular, it found an "[u]nchanged small posterior disc osteophyte complex with effacement of the ventral thecal sac without mass effect on the cervical cord," and "no significant neural foraminal

narrowing." The MRI of Proulx's brain was also completed on May 24, 2021, and showed no evidence of "acute intracranial process."

On June 7, 2021, Dr. Blair saw Proulx again. He told Proulx that her "disc bulge is relatively small," warned her that the surgical procedure they had discussed "may not improve her overall symptomatology," but stated that he could not offer any additional non-surgical options. Proulx elected to proceed with the surgical procedure.

Dr. Blair performed the surgery on July 27, 2021. A year after the procedure, Proulx's symptoms persisted. An additional CT scan showed that Proulx's cervical spine had not fused. Dr. Blair performed a second surgery on November 29, 2022, to try to resolve the non-union. According to Proulx, Medicaid covered the expense of both surgeries.

Proulx filed a Workers' Compensation Complaint on May 28, 2020. A hearing before a referee for the Commission was held on March 9, 2023, with only Proulx testifying. The issues set for hearing were: (1) whether the condition for which Proulx sought benefits was caused by the industrial accident; and (2) whether and to what extent Proulx was entitled to medical benefits, temporary disability benefits, and attorney fees. The parties took post-hearing depositions of Dr. Stromberg and Dr. Blair.

In his deposition, Dr. Stromberg acknowledged that he did make a mistake in his IME report. The IME report stated that Proulx had not complained of neck pain until a month after the accident and relied on that point, in part, for the conclusion that the symptoms Proulx complained of did not correlate with a cervical spine condition and that the condition Proulx complained of was not caused by the workplace accident. Dr. Stromberg acknowledged that Proulx's medical records indicated that she mentioned neck pain during the first two healthcare visits following the workplace accident. However, Dr. Stromberg also testified that the records did not change the conclusions contained in the IME, though she may have initially suffered a neck strain that would be "expected to resolve with or without treatment within a few weeks."

Dr. Stromberg explained that none of the imaging provided reason to think that Proulx's symptoms were caused by a neck injury or that she required surgery. He opined that Proulx's reports of numbness and tingling in two fingers of her left hand could not, as a matter of "normal human anatomy," be caused by a cervical injury. The reports of numbness and tingling were also inconsistent, he claimed, with the results of nerve conduction and EMG studies, which would have revealed any peripheral nerve issues associated with an injury to Proulx's cervical spine. He

testified that, while Proulx had some mild cervical stenosis, there was no impingement on her spinal cord, and none of the standard tests for cord compression were positive. Finally, he testified that he had doubts that Proulx accurately reported her pain and symptoms because she "manifested extremely limited range of motion of the cervical spine" during his examination, but he later observed her get into her car with "greatly improved mobility."

Dr. Blair testified that the CT myelogram showed that there was almost no spinal fluid around Proulx's spinal cord at the C6-7 level, and that the cord was flattened, "which is a sign that there's pressure on the nerves and spinal cord." He testified that the fact that Proulx experienced neck pain when she had her accident supported his view that the injury occurred then, as did the fact that her symptoms persisted after treatment of her shoulder and imaging revealed no issues with her shoulder. He disagreed with the view expressed in Dr. Vallin's IME report that Proulx's reported symptoms did not "correlate anatomically" with the "diffuse degenerative changes" in her cervical spine. He likewise rejected Dr. Stromberg's view that the imagining did not show pressure on the spinal cord. He testified that Proulx's symptoms were consistent with a herniated disc pressing on her spinal cord.

The parties submitted post-hearing briefing. Proulx argued that the evidence shows the accident caused a "herniated nucleus pulposus at the C6-7 level," and she was entitled to benefits, including medical benefits for the surgical procedures performed by Dr. Blair and temporary disability benefits for the timeframe following Dr. Vallin's IME report.

The referee issued a written recommendation and concluded that the question of whether Proulx had suffered a neck injury in the accident or reached maximum medical improvement was unripe until Proulx reached medical stability following the second surgery.

On March 4, 2024, the Commission issued its Findings of Fact, Conclusions of Law, and Order, which rejected the referee's recommendation. It did not disturb the referee's finding as to Proulx's "presentation or credibility" at the hearing, which suggested that Proulx might be exaggerating the degree of her pain. The Commission concluded that the "medical records carry more weight" when Proulx's testimony was inconsistent with the records. It found that Proulx established she had suffered a shoulder strain in the accident. But it concluded she had received all benefits to which she was entitled.

It found that Proulx "has not proven she suffered a neck injury caused by the work accident." In doing so, it relied on Dr. Vallin's and Dr. Stromberg's opinions that neurological

9

examinations did not suggest a cervical injury, nor did Proulx's symptoms appear consistent with a cervical injury. "Most concerning" to the Commission was that the medical imaging was consistently read by all providers, except for Dr. Blair, as showing only "mild" or "slight" degenerative changes in Proulx's spine and that those mild changes were unlikely to be responsible for Proulx's symptoms. The Commission found Dr. Vallin and Dr. Stromberg more persuasive than Dr. Blair because he "over rel[ied]" on Proulx's subjective reports and because he ignored or failed to address objective evidence that indicated Proulx's symptoms did not result from a cervical injury.

Proulx filed a timely notice of appeal.

## II.   ISSUES ON APPEAL

1. Whether the Commission erred when it concluded that Proulx did not prove that she suffered a herniated nucleus pulposus at the C6-7 level caused by the industrial accident.

2. Whether either party is entitled to attorney fees on appeal.

## III.   STANDARDS OF REVIEW

"In reviewing a decision of the Commission, this Court exercises free review over the Commission's legal conclusions." *Clark v. Shari's Mgmt. Corp.*, 155 Idaho 576, 579, 314 P.3d 631, 634 (2013). However, "[b]ecause the Commission is the fact finder, its conclusions on the credibility and weight of the evidence will not be disturbed on appeal unless they are clearly erroneous. This Court does not weigh the evidence or consider whether it would have reached a different conclusion from the evidence presented." *Funes v. Aardema Dairy*, 150 Idaho 7, 10, 244 P.3d 151, 154 (2010) (quoting *Eacret v. Clearwater Forest Indus.*, 136 Idaho 733, 735, 40 P.3d 91, 93 (2002)). "[T]his Court views all the facts and inferences in the light most favorable to the party who prevailed before the Industrial Commission." *Bell v. Idaho Dep't of Labor*, 157 Idaho 744, 747, 339 P.3d 1148, 1151 (2014) (alteration in original) (quoting *Neihart v. Univ. Joint Auto Parts, Inc.*, 141 Idaho 801, 802–03, 118 P.3d 133, 134–35 (2005)).

## IV.   ANALYSIS

**A. The Commission did not err when it determined that Proulx failed to prove that she suffered a herniated nucleus pulposus at the C6-7 level caused by the industrial accident.**

"The claimant in a workers' compensation case carries the burden of proving that the condition for which compensation is sought is causally related to an industrial accident." *Jordan v. Dean Foods*, 160 Idaho 794, 799, 379 P.3d 1064, 1069 (2016). The evidence must establish a causal relationship to a "reasonable degree of medical probability." *Anderson v. Harper's Inc.*,

143 Idaho 193, 196, 141 P.3d 1062, 1065 (2006). Where a claimant meets that burden, the employer is generally responsible to provide for medical care that is "reasonably required by the employee's physician" to treat the injury or disease. I.C. § 72-432(1).

The Commission concluded that Proulx failed to prove that she suffered a herniated nucleus pulposus caused by the industrial accident. Proulx argues that the Commission erred and focuses on the Commission's conclusion that "[Proulx] has not proven she suffered *a neck injury* caused by the work accident." (Emphasis added.) Proulx argues that the Commission's conclusion is clearly erroneous because all three providers whose opinions were considered by the Commission—Dr. Blair, Dr. Vallin, and Dr. Stromberg—acknowledged that Proulx complained of neck pain at two medical visits immediately after the accident and also acknowledged that the workplace accident might have implicated her neck. Proulx argues that the Commission's conclusion that she failed to establish she suffered any neck injury is contradicted by all three experts and her medical records.

We are unpersuaded by Proulx's argument because when the Commission's conclusion is viewed in light of the other findings and conclusions contained in the Commission's twenty-one-page decision, it is clear that the Commission's statement was not nearly as broad as Proulx argues. The Commission's conclusion concerning causation did not concern *any* neck injury but instead related specifically to "the condition for which [Proulx] [sought] benefits." The injury for which Proulx sought additional benefits was a "herniated nucleus pulposus at the C6-7 level." As such, the Commission's statement regarding "a neck injury" concerned Proulx's claim that she suffered a herniated nucleus pulposus at the C6-7 level caused by the workplace accident. The record contains substantial and competent evidence supporting the Commission's decision. We therefore affirm the Commission's conclusion that Proulx failed to prove that the neck injury for which she sought additional benefits was caused by the workplace accident.

Dr. Blair was the only medical provider to offer an opinion that Proulx suffered a "herniated nucleus pulposus at the C6-7 level." Dr. Vallin opined that Proulx suffered a "soft tissue sprain/strain involving [Proulx's] left shoulder/shoulder girdle muscles," which was "causally associated with" Proulx's "left lateral neck and upper trapezius symptoms." Dr. Stromberg indicated that Proulx "may" have suffered a shoulder strain but acknowledged that, if she had suffered a cervical strain, it would have resolved in a few weeks. Neither Dr. Vallin nor Dr. Stromberg opined that Proulx suffered a herniated nucleus pulposus from the accident.

11

In fact, both Drs. Vallin and Stromberg rejected the notion that Proulx's industrial accident caused a herniated nucleus pulpous because Proulx's symptoms were not consistent with that kind of injury. Dr. Stromberg testified that the numbness and tingling reported by Proulx in two fingers of her left hand could not, as a matter of "normal human anatomy," be caused by a cervical injury. Dr. Stromberg testified extensively that the imaging showed only mild degenerative changes that (1) did not show nerve or spinal cord compression, (2) did not provide reason to believe Proulx's symptoms were caused by a neck injury, and (3) did not warrant a surgical procedure. Similarly, Dr. Vallin opined that Proulx's "neurologic exam was clinically not suggestive for acute cervical, thoracic, or lumbar radiculopathy or myelopathy." He also opined that Proulx's symptoms "do not correlate anatomically" with the degenerative changes to her cervical spine reflected on the imaging.

Dr. Blair disagreed with the opinions of Drs. Vallin and Stromberg. He opined that Proulx suffered a herniated disc at C6-7 that was caused by the accident. Dr. Blair testified that the CT myelogram showed that there was almost no spinal fluid around Proulx's spinal cord at the C6-7 level and that the cord was flattened, "which is a sign that there's pressure on the nerves and spinal cord." He testified that the fact that Proulx experienced neck pain when she had her accident supports his view that the injury occurred then, as does the fact that her symptoms persisted after treatment of her shoulder and imaging revealed no issues with her shoulder.

The Commission was thus presented with conflicting evidence in the form of differing expert opinions. The Commission is "free to determine the weight to be given to the testimony of a medical expert." *Mazzone v. Tex. Roadhouse, Inc.*, 154 Idaho 750, 756, 302 P.3d 718, 724 (2013) (quoting *Eacret v. Clearwater Forest Indus.*, 136 Idaho 733, 737, 40 P.3d 91, 95 (2002)). We do not disturb the Commission's conclusions on the credibility and weight of the evidence unless they are clearly erroneous. *Funes v. Aardema Dairy*, 150 Idaho 7, 10, 244 P.3d 151, 154 (2010) (citation omitted).

After "[w]eighing the opinions of Drs. Blair, Vallin, and Stromberg," the Commission concluded that Proulx did not prove that her reported neck injury was caused by the industrial accident. The Commission's conclusion was based in part on provider notes suggesting that Proulx had exaggerated her symptoms. The Commission adopted the referee's conclusion that, where Proulx's testimony and her medical records are inconsistent, the records should carry more weight. "Credibility of witnesses and evidence is a matter within the province of the Commission."

12

*Stevens-McAtee v. Potlatch Corp.*, 145 Idaho 325, 329, 179 P.3d 288, 292 (2008). The Commission's credibility determination is supported by substantial and competent evidence in the form of Proulx's medical records, which reflect multiple occasions when a provider or examiner expressed the view that Proulx was magnifying the extent of her pain or seemed unreliable in reporting her symptoms.

The Commission's conclusion that Proulx failed to prove the injury was caused by the workplace accident was also based in part on its finding that Dr. Blair relied too much on Proulx's subjective reports and ignored objective evidence suggesting her symptoms could not be caused by a cervical spine injury. The Commission expressed concerns about the lack of objective evidence supporting the intensity of Proulx's reported symptoms, and their inconsistency with radiologist opinions, neurological testing, and diagnostic imaging. The Commission's view that Dr. Blair overly relied on Proulx's reported symptoms was based both on its view that those reports were not entirely credible and the objective medical evidence indicating the symptoms were not explained by a cervical disc herniation.

Proulx contends that the Commission erred when it determined that Dr. Blair's opinion was less persuasive than the opinions of Drs. Vallin and Stromberg because "all radiologists but one read the diagnostic imaging as showing degeneration 'normal for her age' or 'mild' or 'slight' degeneration which they believed to be a contraindication against the likelihood of [Proulx's] neck being a cause for her pain complaints." Proulx contends that conclusion was erroneous because all imaging studies but one indicated some "abnormalities." But the Commission did not find that there were *no* abnormalities reflected in Proulx's cervical spine. It found that the abnormalities in Proulx's cervical spine were characterized as "normal for her age," "mild," "minor," "slight," etc. The Commission then relied on additional evidence and testimony for its conclusion that the minor abnormalities were not caused by the workplace accident and did not explain Proulx's symptoms.

Dr. Blair opined that Proulx's symptoms were caused by a cervical abnormality in the form of a bulging disc at C6-7 that, he claimed, was putting pressure on Proulx's nerves and spinal cord. The best imaging evidence for that theory, he claimed, was the CT myelogram. The Commission reviewed three reports or notes discussing the CT myelogram, prepared by Dr. Cameron, Dr. Blair, and Dr. Stromberg.

Dr. Cameron characterized the disc bulge at C6-7 as "mild," along with "mild" narrowing of the spinal canal. Dr. Blair was inconsistent regarding what the imaging showed at the C6-7

level. In Dr. Blair's medical evaluation, he stated that it showed "a fairly large central disc bulge with secondary stenosis at C6-7." At Dr. Blair's deposition, he stated that he would not necessarily disagree with Dr. Cameron's statement that it was "mild." In a note just before the first surgery, Dr. Blair described the disc bulge as "relatively small." Finally, Dr. Stromberg has consistently opined that the disc bulge at C6-7 was "mild" or "small," that it did not impinge on the spinal cord or impact nerves, and that there was spinal fluid all around the cord.

Again, while there may be disagreement between Drs. Cameron, Blair, and Stromberg as to the degree of the abnormality reflected on the CT myelogram, the Commission was empowered, as the fact finder, to weigh the competing views. There is substantial and competent evidence in the record to support the Commission's finding that Proulx's cervical abnormalities were mild and were not the cause of her reported symptoms.

Next, Proulx argues that Dr. Vallin's opinions "lack credibility" because Dr. Vallin reviewed a radiologist's interpretation of an MRI of Proulx's spine, but not the MRI itself. After Dr. Vallin's initial IME, he requested an MRI of Proulx's cervical spine. In his report, Dr. Vallin noted the findings of the MRI report as interpreted by the radiologist. He then concluded that Proulx "has diffuse degenerative changes throughout her cervical spine, [but] these findings do not correlate anatomically with the diffuse nature of [Proulx's] left-sided soft tissue/myofascial symptoms." He concluded that the "abnormalities" in Proulx's cervical MRI "are not causally associated with nor permanently aggravated as a result of her claim injury on December 17, 2019."

While it is true that Dr. Vallin reviewed the radiologist's MRI report and not the MRI itself, Proulx cites no authority for the proposition that the Commission was required to discount Dr. Vallin's opinion concerning the MRI or otherwise discount his IME report or his addendum to that report. There is no evidence to suggest that the radiologist's interpretation was erroneous, and Proulx has not shown why Dr. Vallin's reliance on the radiologist's report made his opinion any less credible.

Finally, Proulx identifies two errors in Dr. Stromberg's IME report that she contends cast doubt on his opinion. First, Proulx contends that his IME report misstates the date of her examination, stating that it was January 14, 2020, rather than January 14, 2021. Second, she asserts that he failed to recognize that early treatment notes for Proulx reported neck pain. The former is a typographical error and gives no reason to question the validity of his opinion. The latter was

addressed by Dr. Stromberg in his deposition. A review of his deposition testimony reveals the second mistake does not cast doubt on his opinion.

In his deposition, Dr. Stromberg acknowledged that he was partially mistaken in his IME report when he stated that Proulx had not complained of neck pain until a month after the accident. He acknowledged that the records from her first two healthcare visits following the accident mention neck pain. But he testified that those records did not change his view that Proulx's claimed neck injury did not explain her ongoing symptoms. He stated that, though she may have initially suffered a neck strain, that would be "expected to resolve with or without treatment within a few weeks." The Commission considered this error in the IME report when assessing Dr. Stromberg's opinion and ultimately concluded that his opinion was reliable. Again, it was entirely within the Commission's discretion, as the finder of fact, to determine Dr. Stromberg's credibility and how much weight to assign to his opinion.

For the reasons discussed above, we conclude that the Commission did not err when it determined that Proulx failed to prove that she suffered a herniated nucleus pulposus at the C6-7 level caused by the industrial accident and we affirm the Commission's decision on that issue. Having determined that Proulx failed to establish causation, it is unnecessary to address her second argument concerning entitlement to additional benefits.

**B. Neither party is entitled to attorney fees on appeal.**

Proulx and Respondents both request attorney fees on appeal. Proulx requests attorney fees under Idaho Code section 72-804. Section 72-804 provides for fees where an employer or its surety unreasonably contested a claim that a court later determines should have been paid. Because we affirm the Commission's conclusions that Proulx is not entitled to additional benefits, we conclude that she is not entitled to fees under section 72-804.

Respondents also request attorney fees on appeal but fail to cite authority supporting their request. Respondents cite Idaho Appellate Rules 35(b)(5), 40(a), and 41; Idaho Rule of Civil Procedure 54(d)(1)(B) and (e)(1); and "all other applicable Idaho State Law." None of these rules provide a basis for fees. Because Respondents failed to cite legal authority supporting their request, we decline to award them attorney fees on appeal.

## V. CONCLUSION

For the foregoing reasons, we affirm the decision of the Commission.

Chief Justice BEVAN, and Justices BRODY, MOELLER, and MEYER CONCUR.